Death Opinion














IN THE COURT OF CRIMINAL APPEALS


OF TEXAS







AP-74,852






JOHN ALLEN RUBIO, Appellant



v.



THE STATE OF TEXAS






Appeal of Cause No. 2003-CR-457-A-1 of the


138th Judicial District Court of


Cameron County






 Womack, J., delivered the opinion of the Court, in which Price, Johnson,
 Holcomb, and Cochran, JJ., joined. Keller, P.J., filed a dissenting
opinion, in which Keasler and Hervey, JJ., joined. Meyers, J., dissented.


 The appellant was indicted on four counts of capital murder (1) related to the killing and
decapitation of his three children: Julissa Quesada (age 3), John E. Rubio (age 14 months), and Mary
Jane Rubio (age 2 months). The appellant pleaded not guilty by reason of insanity (2) to all four counts.
The jury found the appellant guilty, and rendered a verdict on the issue of punishment that required the
trial court to sentence the appellant to death. (3) In the appeal to this court, required by statute, (4) the
appellant raises twelve points of error. We will reverse.

I. Did the trial court err by admitting Camacho's statements?

 In his first point of error, the appellant argues the trial court erred during the guilt-innocence
phase of the trial by admitting the statements of Maria Angela Camacho, the appellant's common-law
wife and alleged accomplice in the murders for which he was being tried. Camacho invoked her Fifth
Amendment right to not testify in open court, and the state offered three statements she made to the
police regarding the murders, two written statements and one oral statement recorded on videotape.
Over the appellant's objection, the trial court admitted all three statements. The written statements were
read to the jury by the Brownsville Police Department detectives who originally took the statements.
The videotaped statement was played for the jury, who also received a written transcript. The appellant
was never able to cross-examine Camacho, either at the time she made the statements or during the
trial.

 At the time of the appellant's trial, the admissibility of out-of-court statements against a
defendant where the declarant was unavailable for cross-examination was governed by Ohio v.
Roberts. (5) Under Roberts, such a statement was admissible so long as it bore adequate "indicia of
reliability" or otherwise fell within a "firmly rooted hearsay exception." (6) 

 Since the time of the appellant's trial, however, the Supreme Court overruled Roberts by
announcing its opinion in Crawford v. Washington. (7) Under Crawford, non-testimonial hearsay
evidence would still be admissible under a scheme like that in Roberts, but the Court made clear that,
"Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law
required: unavailability and prior opportunity for cross-examination." (8) Although the Court declined to
define specifically what is encompassed by the term "testimonial," they did say that at a minimum it
includes "police interrogations," because they are one of "the modern practices with closest kinship to
the abuses at which the Confrontation Clause was directed." (9)

 The trial court in this case held Camacho's statements to be sufficiently reliable, and so they
were admitted. The State does not dispute that Camacho's statements were given during a police
interrogation and therefore testimonial in nature. The State also acknowledges that Camacho had
invoked her Fifth Amendment right at trial and was therefore unavailable to testify. The State does not
concede that the trial court erred in admitting Camacho's statements under the law in effect at the time.
But the State does concede the Supreme Court's holding that new rules of criminal procedure are to be
"applied retroactively to all cases, state or federal, pending on direct review or not yet final," (10) and that
Crawford came into effect while the appellant's case was pending on direct appeal.

 Accordingly, we hold that the trial court erred in admitting Camacho's statements. We will now
turn to the issue of prejudice.

II. Did the trial court's error prejudice the appellant's case?

 The erroneous admission of Camacho's statements does not automatically merit reversal.
Rather, any Confrontation Clause violation, once proven, is subject to harmless error analysis. (11) In
other words, this Court will reverse the conviction unless we determine beyond a reasonable doubt that
the error did not contribute to the appellant's conviction. (12) If there is a reasonable likelihood that the
error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable
doubt. (13) 

 An appellate court should not focus on the propriety of the outcome of the trial. (14) Instead, we
calculate the probable impact of the error on the jury, in light of all other evidence available. (15) Evidence
of the defendant's guilt should be considered, but that is only one factor in the analysis. (16) The question,
ultimately, is whether the State has proven beyond a reasonable doubt that the error complained of did
not contribute to the verdict obtained. (17)

 In the instant case, the appellant pleaded not guilty by reason of insanity to all four counts in the
capital murder indictment. He did not contest that he committed the acts which killed the children.
Therefore, the only real issue in contention at the guilt-innocence phase was the appellant's state of
mind. The primary evidence relevant to that issue came in the form of statements the appellant and
Camacho made to the police. We will now turn to those.

The Appellant's Statement

 In his own videotaped statement to the police, which was also admitted at trial, the appellant
freely admitted to having killed his children. 

 The appellant said he met Camacho when they were living in the same apartment complex in
2000 or 2001. He used to inhale spray paint with Camacho's then-live-in boyfriend and, after seeing
her physically abused by him, she and the appellant became romantically involved. Camacho eventually
left her former boyfriend and moved in with the appellant. 

 Camacho brought her child Julissa with her, who at the time was less than a year old. 
Camacho was also pregnant with John, who was born eight or nine months later. Although it was
unclear who John's father was, the appellant and Camacho decided to name John after the appellant
and give him the appellant's surname. Shortly after John was born, Camacho became pregnant again,
and gave birth to Mary Jane in January of 2003.

 During this time the appellant held a number of low-wage retail jobs, and the family moved
several times, including time spent in friends' houses and sometimes living on the streets. Eventually they
moved into a home they shared with the appellant's mother and one other person. 

 The appellant said Child Protective Services took custody of Julissa and John at one point
during this time, after finding the appellant was abusing spray paint in front of the children. This incident
inspired him to find a job so he could get the children back, because he "adored" them and "would do
anything for" them. CPS returned the children after three or four months - after the appellant got a job
- but continued to visit the home to check on the children and to test the appellant for illegal drug use.
Those tests, the appellant claimed, never yielded a positive result for illegal drugs.

 The appellant said CPS stopped making home visits after he got a job at Golden Corral. He
lost this job in December of 2002, a month before Mary Jane was born. During that time, in order to
make money to pay rent and provide for the children, the appellant did some odd jobs but also
prostituted himself. He learned how to be a prostitute from his mother, who had encouraged him to do
so. 

 With the money the appellant made through prostitution, he was able to pay the rent when it
came due on January 11th and February 11th of 2003, but he did not have enough money for the
March 11th payment. He had $175 in a wallet, but it was stolen from his house. He asked his brother if
the family could move into his brother's house, but his brother refused. He asked his brother's girlfriend
Beva to loan him the money, but she too refused. Around this time, the family found out the food stamp
benefits for the children were being cut off because of a problem with the children's paperwork.
Because of the various money problems the family was experiencing, the appellant decided to take the
children to a local homeless shelter. This was the day before the children were murdered.

 That same evening, the appellant's mother came to the front door of the house. The appellant
had recently thrown his mother out of the house because she had not paid her share of the rent. The
appellant let his mother inside the house because she was now acting very nicely towards him, but once
inside, she began to act strangely. She was pacing back and forth, alternatively smiling at him and acting
angry towards him, and talking to herself. She left after less than an hour. Shortly after that, the
appellant heard another knock at the door. This time it was Lorena, a male transvestite prostitute who
was the other tenant in the house with the appellant and his family. Lorena was with a friend. They
stayed approximately twenty minutes, talking amongst themselves, then left. It was now close to
midnight.

 Camacho and the children were still awake, watching television in the bedroom. Because the
appellant's head was hurting, he turned off the television and turned on the radio to listen to Christian
music in order to distract himself. He and the children began to fall asleep, but Camacho woke him up.
He then put John into the crib, while the two girls remained sleeping on the bed.

 The appellant returned to lay down on the bed and listen to music. As he lay there, he said he
suddenly felt weird, as if something bad was going to happen. He began to hear strange, scary noises,
and he saw mice running around on the floor, which he had never before seen in that house. He then
heard his hamsters fighting with each other, which was also unusual. He kept five to seven hamsters as
pets in a cage near his bed. He described what he saw next as being "like a movie, or something I saw
on TV." The hamsters would look at him with a nasty expression and then growl. He said this had
happened only rarely before, and only when his mother or Lorena were at the house.

 The appellant then decided to kill the hamsters, which he did by spraying them with hairspray
so they would choke. He brought the cage into the front room of the house. Some were still alive, so he
put bleach on them, and then took them out one at a time and smashed their heads with a hammer. He
then flushed them down the toilet.

 Julissa, hearing the appellant killing the hamsters, awoke and came into the front room. She then
started to act strangely:

 [The appellant]: And she started talking in like, demonized - like, she was
looking at me, like, weird.

 

 [Police detective]: Give me an example of what she was saying.

 

 A: Like (descriptive sound). She was, like, acting weird, like - I don't know. I
can't do it like she did.

 

 Q: She was only making sounds; she wasn't saying anything?

 

 A: She was making sounds, and then she was, like - and she doesn't know
English. I was, like (speaking Spanish).

 

 Q: Who were you talking to?

 

 A: To her. She was two people in one. Camacho had awoken by this point and was watching the scene herself. The appellant asked
Julissa who she was, because she was acting like someone else, and she told the appellant she was his
grandmother. He began to speak with Julissa as if she was his grandmother, and Julissa would respond:

 [The appellant]: ...so I asked her, "Is it you, Grandma?" She said, "Yes."
"What did you do with my daughter?" She goes, "She's right there," like she was inside
my other girl, like Mary Jane. I said, "What do you mean? That's Mary Jane, that's not
you." "No." I said to her, like, she was trying to give me - like tell me, but she couldn't
say it, like, "Yo es ella, y ella es yo."


 [Police detective]: What she was trying to tell you, was that she was -


 A: She was in her body -

 

 Q: That your grandmother was in Julissa's body?


 A: Yes.


 Q: And Julissa's body was in -


 A: In Mary Jane's body.


 Q: - Mary Jane's body?


 A: Uh-huh. The appellant seemed to resign himself to the fact that his grandmother was possessing his
daughter's body, although it was "a little weird." He went into the kitchen to make something to eat, but
he started to feel woozy, so he went back into the front room. He then saw Julissa cutting the tape off
of an electrical outlet, which the appellant had put over the outlet to prevent the children from hurting
themselves. He said it appeared to him that Julissa was cutting the tape with a pair of scissors, and then
trying to give the scissors to John so that he could stick them in the outlet and electrocute himself. The
appellant had taken John out of his crib at some point earlier.

 The appellant said he believed his grandmother's spirit, possessing Julissa's body, was
attempting to harm John. He shook Julissa and blew in her face, in an attempt to cast the grandmother
out. He then put John back in his crib and began to choke Julissa. He thought he had succeeded in
casting out the grandmother's spirit, but in fact Julissa either passed out or died because the appellant
was choking her. He then called to her and she revived, but began to say that she wanted to harm the
children, to make them and him suffer.

 Camacho had entered the room at some point while the appellant was choking Julissa. After
Julissa revived and spoke, the appellant asked Camacho to hold Julissa down while he choked her. He
said Camacho did so, but that Julissa "didn't want to die." He then told Camacho to go to the kitchen
and bring him a knife, which she did, returning with two knives. The appellant then stabbed Julissa
several times in the chest. He then turned her over and stabbed her in the back of the head because he
wanted to remove her brain. He said Camacho was holding down Julissa's feet and legs but turning her
head away to avoid seeing what was happening. Over the next five to ten minutes, the appellant cut off
Julissa's head with the kitchen knife. He said Julissa's lips were still moving and talking, and this scared
him so he separated the head from the body. He eventually put Julissa's body in the kitchen sink so he
could wash it.

 The appellant then noticed Mary Jane looking at him, and he said to Camacho, "She's next
because she's also possessed, they're - all three together." He then choked Mary Jane, and she
seemed to die more easily, but she then revived just as Julissa had. Mary Jane began to laugh, and he
started laughing with her, which suggested to him that something was wrong. He then decided to
decapitate Mary Jane as well. After doing so, he brought her body into the kitchen, where he
proceeded to "cleanse" the girls' bodies by pouring water into their throats where they had been cut. (18)

Camacho's Statements

 Camacho made three statements to the police, two written and one videotaped, that were all
offered and admitted by the State during its case-in-chief at the guilt-innocence phase. As noted above,
Camacho invoked her Fifth Amendment rights and was thus unavailable for cross-examination.

 Camacho gave the first statement on the evening of March 11, 2003, the same day as the
murders. It was read to the jury by Detective Chris Ortiz of the Brownsville Police Department, the
same person to whom the statement was made. Her statement largely corroborated the appellant's,
although it gave more background information than the appellant's. For example, she told of how the
children had been sick with fever for the three days leading up to the murders. She said the day before
the murders, a woman they saw while riding the bus gave John a piece of candy. The appellant believed
the woman cast a spell on the children, causing them to be sick. When they returned home, the
appellant had her break an egg in a glass of water, and the way in which the egg yolk floated told them
that someone had done something bad to Julissa. She also mentioned the appellant's mother coming to
the house that night, and the appellant and his mother discussing using the powers of witchcraft to help
the children.

 There was some inconsistency between the appellant's statement and Camacho's, however.
For instance, Camacho said the appellant claimed to see possession in both girls simultaneously, and he
strangled both girls simultaneously while she held them down. Camacho said, "Mary Jane started
staring right at my eyes, real bad, like with anger, and evil at the same time." Camacho also said the
appellant killed Mary Jane first, then Julissa, and he did so only by cutting off their heads - she did not
mention him stabbing Julissa first. She then tells of killing John in the same manner.

 Camacho then said after all three children were killed, she and the appellant took a shower
together. The appellant told her he was dying, and so they should make love for the last time, which
they did. Afterwards, he told her again he was dying, after which she tried to cut her wrist because she
did not want to live without her husband and children. The appellant gradually started to feel better, and
so Camacho told him she wanted to bury the children. They gathered the children's bodies, along with
the knife they used, into a trash bag for that purpose.

 Shortly afterwards, the appellant's brother showed up at the house, discovered what had
happened, and called the police. Camacho said when Detective Ortiz asked her at the scene why the
floor of her apartment was wet, she told him, "I cleaned the floor before and after we killed the babies."
When Ortiz asked her why the door off the kitchen to the outside had been nailed shut, she said the
appellant had done so before killing the children "because we didn't want anyone or any bad spirits to
come in through that door."

 Camacho gave her second statement the following morning, on March 12th, to Detective
Thomas Clipper of the Brownsville Police Department, who read it to the jury at trial. In that statement,
Camacho said she wanted to tell the detectives the "real reason" her children were killed. She said
specifically, 

I would like to start saying that yesterday I told the detectives that witchcraft was the
reason that John and I killed our children. That was not true. The reason that we
decided to kill the children was because of money problems.


 Camacho then told of how the family had been having financial difficulties, particularly in paying
the rent. Consistent with the appellant's statement, she said the day before the murders, they received
notice that the family's food stamp benefits were about to end because Julissa's social security number
did not match up with her birth certificate. By the morning of March 11th, with no money for food or
clothing for the three children, and upon learning they would not be able to stay with the appellant's
brother in the event they were evicted from their apartment, Camacho and the appellant discussed the
situation and decided it would be "better for the children to die than to suffer."

 Her account of how they killed the children more or less matched up with that of the first
statement, except that Camacho said she witnessed the appellant kill the hamsters as well. She said that
when the appellant told her he wanted to cut the children's heads off, she asked him why. He replied,
"Because . . . we had no money. No way to take care of them. It is better that they go with God." She
said again that they killed the girls first, and about two hours later they decided to kill John because they
did not want him to suffer alone.

 Camacho gave her third statement to Detective Sam Lucio (along with Clipper), on the evening
of March 13th. The statement was videotaped, and the tape was played for the jury at trial. The jury
also received a transcript of the tape to refer to as they watched. In the third statement, Camacho gave
more background on her life and how she and the appellant met, and her story more or less matches
with his. She again told of the money problems they were having in the days leading up to the murders,
but when asked directly if the appellant had prostituted himself for money during that time she replied,
"No."

 The detective asked Camacho about the two conflicting prior statements she had given about
the murders and asked that she now give a true account. Camacho's answer incorporated both prior
motives given. She repeated the story about their difficulties with the rent money just before the
murders, and she added that the children were suffering because, among other things, the apartment
they lived in apparently had no water or electrical service. Yet she also said the night before the
murders, she and the appellant felt "strange" and "weird." She said the appellant killed the hamsters the
next morning "because we thought they were bringing evil" and it was contributing to the children's
suffering. She again said the appellant nailed the kitchen door shut in order to ward off "bad spirits."

 Overall, Camacho spoke often in the third statement of the children's suffering, but it is unclear
if she meant they suffered because of the family's financial problems or because they were possessed,
as she and the appellant seemed to believe they were:

 [The Detective]: Were the children hungry?


 [Camacho]: I would give them milk. To Julissa, I would ask her, and she would
say that she was not hungry, that she was not hungry. She was unable to talk. She could
not talk. She would just do like this, but she would not say anything. She couldn't say
anything.


 Q: And then what happened?


 A: What happened? We decided the best thing to do would be to do what

we did, because I would see that the children were suffering a lot.


 Q: So they would not suffer?


 A: Uh-huh.


 Q: What type of suffering were the children having?


 A: They could not sleep. They would wake up and they would be scared.


 Q: Only that night?


 A: No. They had been like that for a while.


 Q: Was that the first night that things were weird?


 A: The first night that things were weird, but there were some days in which the
children were like that.


 Q: But this is the first time that you thought that there was something strange?


 A: Yes.


 Q: And that's why he killed the hamsters. And then you said that in order for
the children not to suffer - was it your idea or his idea?


 A: Both of us.


 Q: Both of you?


 A: Uh-huh.


 Q: Were you talking about it?


 A: Yes.


 Camacho's account in the third statement of how the children were killed largely matches the
other two. She says she did not see the appellant stab Julissa, but also that she was looking away, and
she does not deny that he stabbed her. She said that when they were discovered by the appellant's
brother, the appellant told him, "that we didn't want to do it, that he didn't want to kill them, that he
only wanted the children to be well." She also repeated the story about the interaction with the woman
on the bus the day before.

 One new detail that Camacho mentioned in the third statement was that she and the appellant
planned to "go away" after they buried the children. When asked about it, her answers were the last
portion of the statement:

 [Police Sergeant]: You said that you were going to go away. Why is it that you
said you were going to go away?

 

 [Camacho]: Because we were afraid. I didn't want to lose my husband again,
since he had gone to jail before. I was afraid because I had never been in jail before.


 Q: You felt like you were going to jail?


 A: Yes, because we did something wrong.


 Q: And your husband knew that he had done wrong?


 A: Yes, we knew.


 Q: Both of you knew that you had done wrong. What did you do that was
wrong?


 A: We did wrong in killing the children, in the way - in that way, with the
government. I only thought that the children were not going to suffer anymore. That's
the only thing I had in my mind. I didn't have in mind that we were going to jail until the
end.


 Q: Thank you.


Analysis

 Because Camacho was an accomplice to the murders, and both the appellant's common-law
wife as well as the mother of the victims, any testimony she gave at trial was likely to be compelling.
That does not foreclose our analysis, however. If the record shows, beyond a reasonable doubt, that
Camacho's erroneously admitted statements did not contribute to the guilty verdict, then that
constitutional error was harmless.

 Here, because the appellant pleaded not guilty by reason of insanity, the primary issue to be
resolved at trial was the appellant's state of mind when he committed the murders. That is, whether the
appellant, at the time of the conduct charged, as a result of severe mental disease or defect, did not
know that his conduct was wrong. (19) Of all the witnesses presented by the State, Camacho was in the
best position by far to refute the appellant's contention that he was insane. And her statements do
precisely that - particularly the second statement, in which she plainly states that the reason they killed
the children was not because of witchcraft, but because of money.

 Even more troubling, of all the witnesses presented by the State, Camacho had the most
incentive to be less than truthful, because she herself was directly involved in the children's murders. In
fact, the original capital indictment named Camacho and the appellant as co-defendants, before their
causes were later severed. The testimony of accomplices is discussed in Crawford as one of the "core
testimonial statements that the Confrontation Clause plainly meant to exclude." (20) In this case,
Camacho's statements directly refute the appellant's only real defense. Moreover, she made three
statements to the police, all of which contradict each other to some extent. The lack of opportunity for
the appellant to cross-examine her, therefore, had a devastating effect on his case.

 The State, in its brief, contends the erroneously admitted statements were not so harmful, or at
least not harmful enough to merit reversal. The State makes its argument in the context of Shelby v.
State, (21) which describes a test for determining harm in Confrontation Clause cases. Although Shelby
pre-dates Crawford, we will address the State's arguments in turn.

 First, the State contends that Camacho's statement was relatively insignificant, in that it was far
outweighed by the other evidence presented, particularly the appellant's own statement in which he
admits killing the children. The State submits that, in light of the substantial evidence of the appellant's
culpability, Camacho's statement was unnecessary to establish his guilt. 

 As stated above, however, the issue at trial was not really the appellant's responsibility for the
children's deaths. The appellant freely admitted that he killed the children. Instead, the issue was
whether the defendant was legally insane. His own statement supported a finding of insanity, in that he
spoke extensively of demonic possession and "evil" in the children that caused him to commit the
murders. Camacho's second statement directly contradicts that argument, by asserting that she and the
appellant killed the children because of money problems. Worse, Camacho says in her third statement
that the appellant "knew" that what he had done was "wrong," which directly refutes the legal definition
of insanity. Given Camacho's unique position as both accomplice to the crime and direct witness to the
appellant's motivations, her specific, detailed testimony obviously had great significance.

 The State also dismisses the importance of Camacho's statement as being merely cumulative of
other evidence, and corroborated by the appellant's own statement. Yet the record shows this to be
true only as to the facts of the murders themselves, namely, the methods employed and the chronology.
As to the more important issue - the appellant's motive - there are clear discrepancies between the
appellant's statement and those of Camacho. And, even if Camacho's statement matches with the
appellant's, that does not change the fact that Camacho herself was facing indictment for capital murder
when she spoke with the police. Obviously then, she could have been under some pressure to modify
her story, given her own participation in the murders. That is precisely the type of issue the appellant
was not able to address on cross-examination.

 The State further argues that Camacho's statement was of little importance because the
appellant had admitted responsibility for the murders, and the substance of Camacho's statement was
shown to be "accurate" by corroborating forensic and DNA evidence. Again, however, Camacho's
statement can only be said to be accurate as to the grisly details of the murder itself. It cannot be said
that her statement was "accurate" as to the appellant's motives because she gives at least two
conflicting motives for the appellant's actions.

 The State also argues that any harm caused by not cross-examining Camacho was cured at
least in part by the opportunity to cross-examine other State's witnesses, such as the officers who
interrogated Camacho and later read her statements to the jury. Even if this were true, it is clear under
Crawford that the statements of accomplices are normally particularly harmful. And it is difficult to see
how cross-examining the interrogating officers, who can only speculate as to Camacho's motives and
influences to testify, would have anywhere near the same effect as cross-examining Camacho herself.

 Finally, the State contends the prosecution's case was strong overall, even without Camacho's
statements. Again, however, the State focuses on the evidence which proves the appellant's actual
participation in the murders, such as his own statement and the physical evidence corroborating his and
Camacho's accounts of the murders. That evidence is indeed overwhelming. Yet the crucial evidence to
rebut the appellant's contention that he was not guilty by reason of insanity came almost exclusively
from one source: Camacho's statements. 

 Camacho, who was not only at the scene but by her own admission was an accomplice, told
the jury (as read by Clipper): "The reason that we decided to kill the children was because of money
problems." Later, she told the jury (in her videotaped statement) that she and the appellant "knew" they
had "done wrong." No physical evidence presented at trial could corroborate these statements. On the
other hand, there were many factors that could have affected the statements' accuracy, including
Camacho's own pending prosecution for her involvement in the murders, her state of mind due to the
horrific acts in which she had just participated, and her mental competency, given that she was a high
school dropout with at least some time spent in special education courses. It is obviously not for this
court to say whether Camacho's statements were accurate or not. Yet we can say that her statements
likely contributed to the jury's verdict of guilt, such that the error in admitting her statements at trial
clearly prejudiced the appellant's case. We sustain point of error one.Conclusion

 Having sustained the appellant's first point of error, we need not address the other eleven. We
reverse the verdict of guilt and remand this cause to the trial court.

Delivered: September 12, 2007

Publish

1. See Penal Code §19.03(a)(8).
2. See Code Crim. Proc. art. 46.03 §§ 1-3, repealed by Acts 2005, 79th Leg., ch. 831, § 1.
3. See Code Crim. Proc. art. 37.071, § 2(b), (e), (g).
4. Id., § 2(h).
5. 448 U.S. 56 (1980).
6. Id., at 66.
7. 541 U.S. 36 (2004).
8. Id., at 68.
9. Ibid.
10. Griffith v. Kentucky, 479 U.S. 314, 328 (1987).
11. Crawford, 541 U.S., at 76 (Rehnquist, C.J., concurring); See also, Lilly v. Virginia, 527 U.S. 116, 140 (1999).
12. R. App. Proc. 44.2(a); Chapman v. California, 386 U.S. 18, 24 (1967).
13. Satterwhite v. Texas, 486, U.S. 249, 256-57 (1988); Wesbrook v. State, 29 S.W.3d 103, 119 (Tex. Cr. App. 2000).
14. Wesbrook, 29 S.W.3d, at 119.
15. Harris v. State, 790 S.W.2d 568, 586 (Tex. Cr. App. 1989).
16. Motilla v. State, 78 S.W.3d 352, 357 (Tex. Cr. App. 2002).
17. Satterwhite, 486 U.S., at 258-59 (quoting Chapman, 386 U.S., at 24).
18. There was presumably more of the video statement to be shown (i.e., describing John's murder), but there
was apparently a dispute over the transcription/translation and ultimately the jury only saw the video up to this point. 
See Reporter's Record Vols. 22: 278; 23:3-7.
19. Penal Code § 8.01. 
20. Crawford, 541 U.S., at 63-4.
21. 819 S.W.2d 544, 546-47 (Tex. Cr. App. 1991).